IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2011 APR 27  PM 4: 24

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
          DEPUTY

**BERKLEY   REGIONAL   INSURANCE
COMPANY, as Subrogee of Venus Rouhani and as
Assignee/Subrogee of the Tower of Town Lake
Condominium Association,**
                         **Plaintiff,**

-vs-                                                    Case No.  A-10-CA-362-SS

**PHILADELPHIA   INDEMNITY   INSURANCE
COMPANY,**
                         **Defendant.**

_____

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Plaintiff Berkley Regional Insurance Company's Motion for Summary Judgment [#31]

and Supplement [#55] to the motion, Defendant Philadelphia Indemnity Insurance Company's

response [#43] and amended response [#45] thereto, and Berkley's reply [#52]; Philadelphia's

Motion for Leave to File First Amended Answer [#32], Berkley and Nautilus Insurance Company's

joint response [#39] thereto, and Philadelphia's reply [#46];  Nautilus' Motion for Summary

Judgment [#33], Philadelphia's response [#44] thereto, and Nautilus' reply [#50]; and Philadelphia's

Motion for Summary Judgment [#34], and Berkley's response [#42] thereto.  Having reviewed the

documents, the relevant law, and the file as a whole, the Court now enters the following opinion and

orders GRANTING Philadelphia's Motion for Leave to File First Amended Answer; GRANTING

IN PART  and  DENYING IN PART  Philadelphia's  Motion  for  Summary  Judgment  [#34];

GRANTING Nautilus' Motion for Summary Judgment [#33]; and GRANTING Berkley's Motion for Summary Judgment [#31].

### Background

This is an insurance case which, while factually straightforward, is contractually complex. In short, the question is whether Philadelphia must pay on an excess insurance policy.  For the following reasons, the Court finds it must.

**I.      Factual Background[1]**

As described in more detail below, there are five players in this legal drama.  The first two, who set the underlying events in motion but are now background characters, are Venus Rouhani and the Towers of Town Lake Condominiums.  In 2004, Rouhani injured herself at the Towers, sued Towers, and was awarded a substantial judgment.

Enter the three insurance companies.  Nautilus Insurance Company provided a primary liability policy to Towers, with a coverage limit of $1,000,000.  Philadelphia Indemnity Insurance Company provided an excess policy with a limit of $20,000,000.  Berkley Regional Insurance company got involved only after Towers appealed the jury verdict in Rouhani's case, when Berkley guaranteed Towers' supersedeas bonds.  Now, these three insurance companies—Nautilus, the primary insurer; Philadelphia, the excess insurer; and Berkley, the supersedeas guarantor—are fighting over who owes how much to whom.

---

[1] Berkley's pleadings allege the following facts, which are undisputed unless otherwise noted.

A.     **Rouhani's Injury and Lawsuit**

In May 2004, a woman named Venus Rouhani was injured when she slipped and fell onto the concrete deck of a swimming pool at the Towers of Town Lake Condominiums. Notice of Removal [#1], Ex. A (Petition) at ¶ 5.1. Rouhani suffered a comminuted fracture of her right humerus and, after undergoing physical therapy, was able to return to her dental practice in July 2005. *Id.* at ¶ 5.2. In fall of that year, Rouhani developed avascular necrosis of her injured humerus, causing the bone of her arm to die due to lack of adequate blood supply. *Id.* As a result of this condition, Rouhani was forced to abandon her dental practice. *Id.*

Rouhani sued the Towers of Town Lake, alleging the enamel paint used on the concrete pool deck was an unreasonably dangerous condition, and the Towers failed to exercise ordinary care to protect her from that condition. *Id.* at ¶ 5.1. A jury agreed with Rouhani and awarded her the sum of $1,654,663.50, plus post-judgment interest. *Id.* at ¶ 5.3.

B.     **The Towers' Post-Trial Insurance Saga**

At the relevant time, the Towers had two insurance policies which potentially covered its liability to Rouhani. First, Nautilus Insurance Company provided primary liability insurance with a policy limit of $1,000,000 per occurrence. *Id.* at ¶ 5.4. Second, Defendant Philadelphia provided an excess/umbrella insurance policy with a coverage limit of $20,000,000. *Id.* at ¶ 5.5.

When the Towers decided to appeal the trial court judgment, a third insurance company came into play. So it would not have to pay the judgment during the pendency of its appeal, the Towers procured two supersedeas bonds, both of which were guaranteed by Plaintiff Berkley Regional Insurance Company. *Id.* at ¶¶ 5.7–5.8. Ultimately, however, the Towers' appeals were fruitless and the trial court judgment was affirmed. *Id.* at ¶ 5.7.

By April 15, 2010, accrued interest on the judgment brought the sum owed by Towers to Rouhani to $2,167,300.30. *Id.* at ¶¶ 5.11–5.12. Nautilus paid to Rouhani the sum of $1,457,561.41, a figure representing its policy limit plus applicable interest. *Id.* at ¶ 5.11. In a letter dated December 17, 2009, however, Philadelphia refused to pay under its excess policy, claiming it received late notice of the claim from Towers. *Id.* at ¶ 5.10; Berkley's Motion for Summary Judgment [#31], Ex. 14 at 1–2.

Consequently, there remained an outstanding balance owed to Rouhani of $709,738.89,[2] which Plaintiff Berkley paid, as guarantor of the supersedeas bonds, to keep Rouhani from executing the judgment against Towers. *Id.* at ¶ 5.12. Understandably, Berkley was not happy about this state of affairs, and sought to recover that sum from one of the other entities involved—namely, Defendant Philadelphia.

## C.      The Tangled Contractual Web

In return for Berkley paying the judgment owed her, Rouhani assigned her rights under the judgment to Berkley.[3] *See* Berkley's Motion for Summary Judgment [#31], Ex. 12 at 13. Berkley's

---

[2] The Court notes the value is listed consistently as $709,738.89 in Berkley's complaint, and consistently as $709,738.09 in Berkley's motion for summary judgment. The Court uses the former.

[3] Even in the absence of an assignment, it appears Texas law provides for statutory subrogation under such circumstances:

(a) A judgment is not discharged by a surety's payment of the judgment in whole or part if the payment:

   (1) is compelled; or

   (2) if made voluntarily, is applied to the judgment because of the suretyship relationship.

(b) A surety who pays on a judgment as described by Subsection (a) is subrogated to all of the judgment creditor's rights under the judgment.

Tex. Civ. Prac. & Rem. Code Ann. § 43.004.

motion for summary judgment describes Berkley's subsequent contractual maneuvering in its attempt to recover from Philadelphia.

First, on or about April 13, 2010, Berkley made a deal with the Towers: in exchange for Berkley not attempting to recover from Towers (which likely could not have satisfied the debt in any case), Towers assigned all its contractual and extra-contractual rights against Philadelphia to Berkley. *See* Berkley's Motion for Summary Judgment [#31], Ex. 12 at 3–10. Likewise, Towers assigned all of its contractual and extra-contractual rights against Nautilus to Berkley. *Id.* at 5. Notably, this deal included any *Stowers*[4] claim the Towers might have had against Nautilus. *Id.* at 7.

As a result of the subrogation and the assignments, Berkley claims it held all of Rouhani's rights, and all of the Towers' rights, to recover against both Nautilus and Philadelphia. *Id.* As Berkley's counsel candidly admitted in open court, however, Berkley and Nautilus are related companies. Thus, Berkley had no interest in recovering from Nautilus. Consequently, on May 6, 2010, Berkley assigned all of its rights to Nautilus in exchange for $709,738.89, the sum Berkley paid to Rouhani. *Id.* Although Nautilus is now the real party in interest, this deal apparently included an agreement by which Nautilus could sue Philadelphia under Berkley's name. *Id.*

Thus, Berkley–Nautilus is now suing Philadelphia for the $709,738.89 plus interest, costs, and attorneys' fees, as well as related state law claims.

---

[4] Named after *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved), so-called *Stowers* liability arises when there is "coverage for the third-party's claim, a settlement demand within policy limits, and reasonable terms such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." *Phillips v. Bramlett*, 288 S.W.3d 876, 879 (Tex. 2009) (quotation omitted). "When these conditions coincide and the insurer's negligent failure to settle results in an excess judgment against the insured, the insurer is liable under the Stowers Doctrine for the entire amount of the judgment, including that part exceeding the insured's policy limits." *Id.*

## II.     Procedural Background

Berkley originally filed suit on April 26, 2010, in the 419th Judicial District Court, Travis County, Texas.  Berkley's petition alleged five state law causes of action: (1) breach of contract; (2) violation of Texas Insurance Code § 541.060 for alleged unfair settlement practices; (3) violation of Texas Insurance Code § 541.061 for alleged misrepresentations; (4) violation of Texas Insurance Code §§ 542.051 and 542.060 for alleged failure timely to pay the claim; and (5) enforcement of judgment in the amount of $709,738.89.  Philadelphia filed an answer generally denying Berkley's allegations but, significantly, asserting no affirmative defenses.

On May 25, 2010, Philadelphia removed to this Court on the basis of diversity.  On December 28, 2010, Philadelphia filed a motion for leave to file a third-party complaint, which motion was granted by the Court on January 19, 2011.  On the same day, Philadelphia filed its third party complaint, alleging it was entitled to contribution or indemnity from Nautilus for any amount Philadelphia might owe, because of Nautilus' *Stowers* liability to the Towers.

Berkley, Nautilus, and Philadelphia all filed motions for summary judgment on January 31, 2011.  In summary, Berkley argues it has all possible rights against Philadelphia and therefore all it must do to win this suit is prove Philadelphia's policy covered Rouhani's injury.  Berkley argues Rouhani's injury is clearly covered by the terms of Philadelphia's policy, and such coverage is not precluded by any late notice Philadelphia may have received because Philadelphia was not prejudiced by it.

Philadelphia attacks Berkley's web of contracts on multiple fronts. First, Philadelphia argues Berkley may not bring this suit because it lacks standing, either because it has, by its own admission, assigned its rights to Nautilus; or because, having been paid off by Nautilus, Berkley has suffered

no damages.  Second, Philadelphia argues any purported assignment of the Towers' rights or duties to either Berkley or Nautilus was ineffective because Philadelphia's policy with the Towers prohibits such assignment in the absence of Philadelphia's written consent, which was not given.  Third, Philadelphia argues Berkley's Texas Insurance Code claims fail because such claims cannot be based on assigned rights.

Finally, Nautilus argues Philadelphia's third-party claims for contribution or indemnification are invalid both because the facts of this case do not give rise to *Stowers* liability; and even if they did, the Towers assigned those rights to Berkley, who in turn assigned them to Nautilus.

### Analysis

I.   **Philadelphia's Motion for Leave to File First Amended Answer [#32]**

Because the fates of some of Philadelphia's arguments rest on the Court's resolution of this motion, the Court addresses it first.  For the following reasons, the Court grants the motion.

Philadelphia's first two defenses—that Berkley lacks standing to bring this suit, and that the Towers' purported assignment of rights and duties to Berkley was ineffective due to an anti-assignment clause in Philadelphia's policy—were not pleaded in Philadelphia's original answer.  Under Texas law, "[l]ack of standing is an affirmative defense." *Faulkner v. Bost*, 137 S.W.3d 254, 259 (Tex. App.—Tyler 2004, no pet.).  Moreover, although it is not clear whether a defendant must plead an anti-assignment clause as an affirmative defense,[5] the parties in this case both appear to

---

[5] Berkley–Nautilus argues an anti-assignment clause constitutes an "exclusion" or an "exception," such that the Texas Insurance Code requires it be asserted as an affirmative defense. *See* Tex. Ins. Code Ann. § 554.002 ("Language of exclusion in the contract or an exception to coverage claimed by the insurer or health maintenance organization constitutes an avoidance or an affirmative defense."). Such a broad construction is somewhat at odds with the liberal language some courts have used in describing anti-assignment clauses: "Anti-assignment clauses are enforceable unless rendered ineffective by a statute. In the absence of a successful attack upon an anti-assignment clause, a party is entitled to have the trial court enforce it." *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721 (Tex. App.—Dallas 2004, no pet.) (citations omitted). Of course, waiver of the defense for failure properly to plead it may be an "attack"

assume that is the case. *See* Berkley/Nautilus Response [#42] at 3 ("Philadelphia failed to plead . . . the 'anti-assignment' clause in its original answer and cannot raise [it] for the first time in its summary judgment motion."); Philadelphia's Motion for Leave to Amend [#32], Ex. A (Proposed Answer) at ¶ 37 (including lack of written consent for assignment as an affirmative defense). The Court therefore joins them in this assumption.

"A party relying on an affirmative defense must specifically plead the defense . . . ." *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 494 (Tex. 1991). Philadelphia's first answer contained no affirmative defenses. Moreover, "[a]n affirmative defense may be raised [for the first time] on a motion for summary judgment only if that motion is the first pleading responsive to the substance of the allegations." *United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301, 1307 (5th Cir. 1987). That is not the case here. Thus, Philadelphia's claims appear to have been waived.

However, Philadelphia's proposed amended answer does include these affirmative defenses. Consequently, if the Court grants Philadelphia's motion for leave to amend its answer, Philadelphia will have preserved these defenses. Conversely, if the Court denies Philadelphia's motion to amend, its defenses will have been waived because they were not timely pleaded.

As the Court noted in its January 18, 2011 Order [#28], the parties themselves agreed to a January 31, 2011 deadline to amend their pleadings, which agreement the Court approved. Because Philadelphia's motion for leave to file an amended answer was filed on January 31, 2011, it was—barely—within this deadline. Neither Berkley nor Nautilus will now be heard to complain

_____

sufficient to render the anti-assignment clause ineffective.

they are prejudiced by deadlines they helped choose and asked the Court to adopt.  Philadelphia's

motion for leave to file its amended answer is therefore GRANTED.[6]

## II.    Motions for Summary Judgment

## A.    Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine dispute as to any material fact and

that the moving party is entitled to judgment as a matter of law.[7]  FED. R. CIV. P. 56(a);  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir.

2007).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury

could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all

inferences drawn from the factual record in the light most favorable to the nonmoving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508.

Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a

motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150

(2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the

nonmoving party's case, the party opposing the motion must come forward with competent summary

---

[6] The Court would not have granted this motion if not for the parties' agreement.  The Court already allowed Philadelphia to amend its pleadings once on January 19, 2011, to add claims against Nautilus.  It is undisputed Philadelphia knew the factual and legal bases for its defenses on this date.  There is no question Philadelphia could have added these defenses to its answer at the same time it filed its third-party complaint against Nautilus.

[7] Amendments effective December 1, 2010 changed Rule 56, moving language from 56(c) to 56(a), and changing the Rule to read "genuine dispute as to any material fact," rather than "genuine issue as to any material fact." FED. R. CIV. P. 56.

judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere

conclusory allegations are not competent summary judgment evidence, and thus are insufficient to

defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343

(5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are

not competent summary judgment evidence. *Id.* The party opposing summary judgment is required

to identify specific evidence in the record and to articulate the precise manner in which that evidence

supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to

support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over

facts that might affect the outcome of the suit under the governing laws will properly preclude the

entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant

and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.*

If the nonmoving party fails to make a showing sufficient to establish the existence of an element

essential to its case and on which it will bear the burden of proof at trial, summary judgment must

be granted. *Celotex*, 477 U.S. at 322–23.

**B.     The Parties' Motions**

**1.     Philadelphia's Motion for Summary Judgment [#34]**

For the following reasons, Philadelphia's motion is GRANTED IN PART and DENIED IN

PART.

a.      **Berkley Lacks Standing**

Philadelphia first argues Berkley cannot bring this suit, both because Berkley has assigned all its rights to Nautilus, and because Nautilus has compensated Berkley for all of Berkley's damages.  This is a purely formal argument, which the Court rejects.

Although Berkley paid to Rouhani the outstanding portion of her judgment, and was intimately involved in the post-trial contractual contortions, there is no question Nautilus is now the real party in interest in this case, and Berkley is simply a nominal plaintiff.  However, there is also no question this was no surprise to Philadelphia.  Further, because Nautilus is a party to this suit, there is no prejudice to Philadelphia in allowing suit to be brought under Berkley's name—the relevant issues, claims, and defenses are essentially identical.  Under these circumstances, the Court declines to entertain this argument, much less grant summary judgment on it.

b.      **Ineffective Assignment**

Next, Philadelphia argues any assignment of policy rights by the Towers to Berkley (and therefore any subsequent assignment by Berkley to Nautilus) was ineffective because of an anti-assignment clause in the policy.  As discussed below, in light of the Court's ultimate conclusion today, the Court has doubts whether Philadelphia is entitled to enforce this clause.  However, for the purpose of its summary judgment analysis, the Court agrees with Philadelphia.  The Court further concludes the clause does not preclude assignment of Rouhani's rights, nor any extra-contractual rights such as *Stowers* rights.

The relevant provision of the Philadelphia policy is Section Four, Paragraph Sixteen, which reads in part:

Transfer of your Rights and Duties under this Insurance

-11-

> Your rights and duties under this insurance may not be transferred without our written consent except in the case of death of an individual Named Insured.

Philadelphia Motion for Summary Judgment [#34], Ex. C at 11. "You" and "your" are defined under the policy to "refer to the Named Insured shown in the Declarations and any other person qualifying as Named Insured under this policy." *Id.* at 2. The "Named Insured" listed in the policy is "Towers of Town Lake Condominium Association, Inc." *Id.* at 63.

Because it is undisputed Philadelphia did not provide written consent, the policy prohibited the Towers from assigning its rights or duties under the contract to Berkley. Consequently, Berkley could not have assigned any of the Towers' contractual rights to Nautilus.

However, the Court disagrees this entitles Philadelphia to summary judgment. First, Berkley is correct the policy had no effect on the rights Berkley obtained as a result of its payment of $709,738.89 to Rouhani. The subrogation of Rouhani's rights to Berkley arose not out of the Philadelphia–Towers policy, but out of Rouhani's contract with Berkley (or statutory subrogation under the Texas Civil Practices and Remedies Code, *see* note 3, *supra*). Thus, Berkley is still entitled to stand in "stand in the shoes" of Rouhani and seek recovery, if any, from Philadelphia.

Second, the Court finds the policy's anti-assignment clause does not extend to the Towers' *Stowers* rights.[8] The anti-assignment clause prevents assignment of "rights and duties under this insurance," a phrase which the Court acknowledges could be construed to include *Stowers* rights.

---

[8] Although the Court addresses the issue of *Stowers* rights because the parties devote a fair amount of time to the question, it seems irrelevant in this case. There is no evidence Towers made any sort of settlement demand, and the undisputed evidence, discussed below, is everybody involved in the Rouhani litigation thought the case would be resolved within Nautilus' $1,000,000 coverage limit. Given the lack of legal or factual support in the record, the Court sees little room for *Stowers* liability in this case.

However, there are two reasons why the Court finds the anti-assignment clause does not extend to *Stowers* rights.

First, an insured's *Stowers* rights do not arise under contract. *See Phillips v. Bramlett*, 288 S.W.3d 876, 879 (Tex. 2009) ("The common law imposes a duty on liability insurers to settle third-party claims against their insureds when reasonably prudent to do so."). Thus, although Philadelphia's *Stowers* duty (and Towers' *Stowers* right) is undeniably related to, and created by, the contractual insurance relationship between Philadelphia and Towers, it is not a right or duty "under" the insurance. Rather, it is a right or duty arising from, but collateral to, the insurance relationship.

Second, the Court agrees the phrase "rights and duties under this insurance," if given a broad construction, could be interpreted to cover all common-law claims related to the insurance relationship, including *Stowers* claims. However, the Court finds this interpretation strained. The Philadelphia policy specifically enumerates, at great length and in some detail, Towers' rights and duties under the insurance. The most natural interpretation of the anti-assignment clause is that these enumerated rights and duties cannot be assigned without the written consent of Philadelphia, not that any right or duty conceivably related to the insurance relationship cannot be so assigned. In any case, to the extent the policy is ambiguous regarding limitations on Towers' assignment rights, the Court is obligated to construe the policy against Philadelphia and in favor of Towers. *Bexar Cnty. Hosp. Dist. v. Factory Mut. Ins. Co.*, 475 F.3d 274, 277 (5th Cir. 2007).

*Stowers* rights may be assigned. *See Charles v. Tamez*, 878 S.W.2d 201, 208 (Tex. App.—Corpus Christi 1994, writ denied) ("We recognize that an insured's right to sue for failure to settle is subject to both equitable subrogation and assignment."). Further, the language of the Towers–Berkley agreement leaves no question Towers assigned its *Stowers* rights to Berkley. *See*

-13-

Berkley's Motion for Summary Judgment [#31], Ex. 12 at ¶ 3 ("Towers also assigns subrogates and transfers to Berkley any and all rights . . . it may have against Nautilus Insurance Company, . . . specifically including any rights included in Texas' *Stowers* doctrine . . . ."). Finally, for the above reasons, the Philadelphia policy did not preclude such assignment.

The Court therefore concludes Berkley properly obtained Towers' *Stowers* rights, and those rights were ultimately transferred to Nautilus.[9]   However, any purported transfer of Towers' contractual insurance rights to Berkley was prohibited, and rendered ineffective, by the anti-assignment clause in the Philadelphia policy.[10]  Philadelphia's motion is therefore granted in part and denied in part on this issue.

**c.      Texas Insurance Code Claims**

Finally, Philadelphia argues Towers' statutory rights under the Texas Insurance Code are personal, punitive in nature, and cannot be assigned.  In support of this argument, Philadelphia cites *American Southern Insurance Co. v. Buckley*, No. 1:09-CV-723, 2010 WL 3834001 (E.D. Tex. Sept. 28, 2010), which itself cites *Great American Insurance Co. v. Federal Insurance Co.*, No. 3:04-CV-2267-H, 2006 WL 2263312 (N.D. Tex. Aug. 8, 2006).

In the latter case, the District Court for the Northern District of Texas extended the Texas Supreme Court's holding in *PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd.*, 146 S.W.3d 79 (Tex. 2004)—that DTPA claims cannot be assigned—to claims under the Texas

---

[9] As Nautilus' motion for summary judgment depends entirely on this question, and because the Court has resolved it in Nautilus' favor, the Court GRANTS Nautilus' motion for summary judgment [#33].

[10] As the Court ultimately concludes Philadelphia should have paid under its policy, it is arguably in material breach of its contract.  A party cannot simultaneously breach a contract, yet still insist on the other party's adherence to it.  Therefore, as mentioned above, the Court has some doubts whether Philadelphia can enforce the anti-assignment clause.  However, as the Court reaches the same result regardless of the enforceability of the anti-assignment clause, it need not definitively resolve the question.

Insurance Code. *Great Am.*, 2006 WL 2263312 at *10. In reaching its decision to extend the holding, the *Great American* court stated, "each and every policy argument articulated by the Texas Supreme Court against assignment of a DTPA claim applies with equal force to a claim brought under the Texas Insurance Code." *Id.*

In *PPG*, the Texas Supreme Court based its conclusion that DTPA claims cannot be assigned on several factors. First, "DTPA claims are unlike most contract-related claims in providing for mental anguish and punitive damages." *PPG*, 146 S.W.3d at 90. Second, the court was concerned assignment of DTPA claims would "skew[] the adversarial process," in that it would incentivize otherwise-liable middle-men to settle with aggrieved consumers for little or no money plus an assignment of the middle-man's right to sue the original seller, particularly where mental anguish and punitive damages were not available against the middle-man, but were available against the seller. *Id.* Because in such a scenario the aggrieved consumer and the original seller likely never would have met, the *PPG* court noted "the litigation [would] continue with the parties in different roles—precisely the results that have led us to prohibit assignments in other contexts." *Id.* Finally, the court noted: "The DTPA is primarily concerned with people—both the deceivers and the deceived. This gives the entire act a personal aspect that cannot be squared with a rule that allows assignment of DTPA claims as if they were merely another piece of property." *Id.* at 91.

The Court finds this reasoning persuasive and, to the extent it applies to Berkley's Texas Insurance Code claims, the Court agrees with the Northern District of Texas the holding of *PPG* should be extended, and assignment of those claims should be disallowed. However, the Court does not think this reasoning applies with full force to all of Berkley's Texas Insurance Code claims.

Specifically, the Court finds Towers' claims under Texas Insurance Code Chapter 541 may not be assigned, but its claim under Chapter 542 may be.

First and foremost, *Great American* considered claims made under Texas Insurance Code § 21.21. *Great Am.*, 2006 WL 2263312 at *10. That section has since been repealed, and its provisions included in various sections of Chapter 541 of the Texas Insurance Code. Thus, *Great American*, by its terms, deals only with claims under Chapter 541 of the Texas Insurance Code. Nor, as described more fully below, does the Court see any reason to extend its holding to Berkley's prompt payment claim under Chapter 542.

Chapter 541 of the Texas Insurance Code is entitled "Unfair Methods Of Competition And Unfair Or Deceptive Acts Or Practices." Violations of Texas Insurance Code Chapter 541 are actionable under the DTPA. *See* TEX. BUS. & COM. CODE ANN. § 17.50(a) ("A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: . . . (4) the use or employment by any person of an act or practice in violation of Chapter 541, Insurance Code."). Treble damages are available under Chapter 541. *See* TEX. INS. CODE ANN. § 541.152(b) ("On a finding by the trier of fact that the defendant knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages."). Finally, as claims under Chapter 541 target deceptive conduct, they are imbued with the same "personal aspect" the *PPG* court identified in the context of DTPA claims.

None of this is true of Chapter 542, "Processing and Settlement of Claims." While failure by an insurer to pay a valid claim promptly may cause the insured some personal distress, such failure is not of the same character as affirmatively deceptive conduct. Further, damages for failure

-16-

promptly to pay are limited to the amount of the claim, plus eighteen percent interest per year and reasonable attorney's fees. TEX. INS. CODE ANN. § 542.060(a). Finally, unlike DTPA or Chapter 541 claims, there is little concern prompt payment claims are susceptible to the sorts of gamesmanship or strategic maneuvering that might skew the adversary process.

Because the rationale of *PPG* does not seem to apply with great force to Chapter 542 of the Texas Insurance Code, the Court declines to extend the holding of that case to claims under that chapter. Consequently, the Court concludes Towers could not assign to Berkley its claims under Chapter 541 of the Texas Insurance Code, but could assign its claims under Chapter 542. Philadelphia is therefore entitled to summary judgment on Berkley's claims under Chapter 541 of the Texas Insurance code, and Philadelphia's motion is granted on these claims.

### d.    Summary — Philadelphia's Motion for Summary Judgment

For the foregoing reasons, Philadelphia's motion for summary judgment is GRANTED IN PART and DENIED IN PART. It is granted with respect to any claims based on Towers' contractual rights under the Philadelphia policy, as well as any of Towers' claims under Chapter 541 of the Texas Insurance Code, because these claims were never effectively transferred to Berkley. Philadelphia's motion is otherwise DENIED.

Moving forward in the analysis, the net result of the Court's conclusions so far is: (1) Berkley–Nautilus may still assert Rouhani's claims against Philadelphia; (2) Towers' *Stowers* rights were effectively transferred to Berkley–Nautilus; and (3) because Towers no longer owns those rights, Philadelphia cannot be subrogated to them if it pays Berkley–Nautilus. The Court must therefore examine Berkley's motion for summary judgment to see if Towers is entitled to coverage as a matter of law under the Philadelphia policy.

2.      **Berkley's Motion for Summary Judgment [#31] and Supplement [#55]**

Berkley argues Towers is entitled to coverage under the Philadelphia policy as a matter of law. In response, Philadelphia makes two arguments why Towers is not entitled to coverage. First, Philadelphia argues Towers is not entitled to coverage because Towers failed to give timely notice of Rouhani's claim. Second, Philadelphia argues Rouhani's claim falls within one of several exclusions to the policy. For the following reasons, the Court rejects Philadelphia's arguments and GRANTS Berkley's motion for summary judgment.

a.      **Lack of Timely Notice**

Under Texas law, "an insured's failure to timely notify its insurer of a claim or suit does not defeat coverage if the insurer was not prejudiced by the delay." *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636–37 (Tex. 2008). As the Court finds Philadelphia was not prejudiced, it does not resolve the question of whether Philadelphia received timely notification.[11]

Philadelphia's first argument, that its policy is a "claims-made" policy and therefore it need not demonstrate prejudice, is without merit. Philadelphia's policy is not a claims-made policy. A claims-made policy is one in which "notice itself constitutes the event that triggers coverage." *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 659 (5th Cir. 1999). However, Philadelphia's policy states:

> We will pay . . . the "ultimate net loss" in excess of the "applicable underlying limit" . . . which the insured becomes legally obligated to pay as damages because of "bodily injury" . . . caused by an "occurrence" . . . which . . . [o]ccurs . . . during the policy period.

---

[11] The Court agrees with the parties this latter question involves factual issues and is therefore not appropriate for summary judgment.

Philadelphia's Motion for Summary Judgment [#34], Ex. C at 2.  Thus, this is an "occurrence" policy, in which coverage is provided for covered events that occur within the policy period.  Notice does not trigger coverage under the terms of this policy.

Philadelphia further argues one of its endorsements, the "Claims Made – Endorsement," changed the policy into a claims-made policy.  However, as Berkley points out, this endorsement is based on the apparent assumption the underlying policy (in this case, Nautilus' policy) was itself a claims-made policy: "The policy noted below . . . provides coverage on a claims made basis." *Id.* at 33.  The characteristics of the policy immediately following are uniformly described as "Per Applicable Underlying Policy." *Id.*  The Philadelphia endorsement goes on to say:

> Solely with respect to coverage provided by this endorsement, it is agreed as follows:
>
> A.   Since coverage afforded by the underlying policy above applies on the basis of claims first made against the "insured" during the period of that policy, then this policy shall apply to those claims on the same basis and in like manner . . .

*Id.*

However, this endorsement is grounded on the false premise the Nautilus policy is a claims-made policy.  In fact, the Nautilus policy contains substantially the same "occurrence" language as the Philadelphia policy. *See* Berkley's Motion for Summary Judgment [#31], Ex. 1 at 13 ("This insurance applies to 'bodily injury' . . . only if . . . [it] occurs during the policy period.").

The apparent intent of the "claims-made" endorsement in the Philadelphia policy is to adopt, on like terms, any claims-made features of the underlying insurance policy.  Because the Nautilus policy is an occurrence policy, the endorsement does not add or change the Philadelphia policy.

Thus, if Philadelphia wishes to avoid coverage for lack of timely notice, it must demonstrate it was prejudiced by the lack of notice. The Court concludes it has not done so.

**b.     Prejudice**

Philadelphia has failed to create a genuine dispute of material fact on the issue of prejudice. The case cited by Philadelphia, *St. Paul Guardian Insurance Co. v. Centrum G.S. Ltd.*, 383 F.Supp.2d 891 (N.D. Tex. 2003), is instructive. First, the *St. Paul* court began its discussion by noting "little authority exists to explain what constitutes sufficient prejudice to relieve an insurer of liability under Texas law." *St. Paul*, 383 F.Supp.2d at 902. However, the court went on to summarize several situations in which Texas courts have found prejudice:

> (1) when the insurer, without notice or actual knowledge of suit, receives notice after entry of default judgment against the insured; (2) when the insurer receives notice of the suit and the trial date is fast approaching, thereby depriving it of an opportunity to investigate the claims or mount an adequate defense; (3) when the insurer receives notice of a lawsuit after the case has proceeded to trial and judgment has been entered against the insured; and (4) when the insurer receives notice of a default judgment against its insured after the judgment has become final and nonappealable.

*Id.*

Philadelphia cites scenario (3) above in support of its argument it was prejudiced by Towers' lack of timely notice. Looking simply at the quoted language, this argument seems plausible. A look at the underlying cases, however, reveals the *St. Paul* court was discussing situations in which the insured failed to notify its primary insurer; thus, the failure to notify in a timely fashion resulted in either no defense to the insured, or a defense based on completely inadequate investigation and preparation.

Here, the situation was very different. Per the terms of its policy, Nautilus defended the Towers against Rouhani's suit—Philadelphia has provided no evidence Nautilus' defense was in any

way compromised by the Towers' alleged late notice to Philadelphia. Moreover, Nautilus had discretion under its policy to settle any claim within its policy limit of $1,000,000. *See* Berkley's Motion for Summary Judgment [#31], Ex. 1 at 13 ("We may, at our discretion, . . . settle any 'claim' or suit that may result. But . . . [o]ur right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements . . . ."). The evidence provided to the Court indicates all settlement discussions prior to trial were within Nautilus' policy limits. Indeed, evidence provided by Philadelphia itself establishes Rouhani was willing to settle for less than $800,000. *See* Philadelphia's Amended Response [#43], Ex. G at 2 ("Our demand going into mediation is $800,000. Obviously, the case can be settled for less than that, but it's a reasonable place to start."). Finally, the argument of Philadelphia's counsel at the hearing—that Philadelphia *might* have intervened in Towers' defense, and it *might* have defended on a different theory, which theory *might* have been successful—is, apart from not being competent summary judgment evidence, simply too attenuated and speculative to demonstrate prejudice.

In short, the record is utterly devoid of evidentiary support for Philadelphia's claim of prejudice. Though oft-repeated, Philadelphia's conclusory statements and unsupported arguments are nevertheless insufficient to create a genuine dispute of material fact on this issue. The Court thus concludes Philadelphia has failed to meet its summary judgment burden by demonstrating a genuine dispute of material fact on the question of prejudice, and Berkley is therefore entitled to judgment as a matter of law on this issue.

**c.    Exclusions**

Finally, Philadelphia argues Towers is not entitled to coverage because Rouhani's accident falls under one of the following exclusions to the policy: (1) the "Construction and Design Defects"

exclusion; (2) the "Designated Work" exclusion; or (3) the "Additional Follow Form Coverages and Exclusions" endorsement.  The Court disagrees.

The "Construction and Design Defects" exclusion indicates the insurance does not apply to claims "arising from or in connection with":

1.   Any defect in construction, whether patent or latent; or
2.   Any defect in construction, including, but not limited to, any defect:
     a.     in materials used in construction; or
     b.     in products used in construction; or,
     c.     in workmanship (including, but not limited to, faulty workmanship);
            or,
3.   Any defect in design, whether patent or latent.

Philadelphia's Motion for Summary Judgment [#34], Ex. C at 49.

The "Designated Work Exclusion" states the insurance does not apply to any liability "arising out of":

1.   Work or operations performed by or on behalf of an insured; and
2.   Materials, parts, or equipment furnished in connection with such work or
     operations; and
3.   Warranties or representations made at any time with respect to the fitness,
     quality, durability or performance of any of the items included in "1." or "2."
     Above [sic].
4.   The providing of or failure to provide warnings or instructions.

*Id.* at 47.  The exclusion goes on to note it "does not apply to general building maintenance or repair and/or 'fit out' operations." *Id.*

Finally, the relevant portion of the "Additional Follow Form Coverages and Exclusions" endorsement excludes from coverage claims "arising from the use, ownership, maintenance, or operation" of, among other things, "unfenced pools." *Id.* at 24.

Rouhani's claim falls under none of these exclusions.  Although the Court is not privy to the trial record, a letter from Rouhani's attorney outlines his theory of liability:

-22-

> [I]t's just not a good idea to paint and repaint and repaint a perfectly good slip-resistant floor, especially when the label on the paint can not only identifies the problem but also the solution. . . . It is foreseeable that if you paint this floor enough times, eventually someone is going to slip and hurt themselves. . . . Other evidence that I intend to offer on foreseeability will include . . . a large maintenance budget compared to the small cost of the additive.

Philadelphia's Amended Response [#43], Ex. G at 3. Rouhani's complaint is consistent with this theory. *See id.*, Ex. A at 5–8. Moreover, the summary judgment record—which is substantial—is entirely devoid of evidence suggesting any contrary theory of liability, any mention of construction or design defects in the pool area, or claims Rouhani's accident occurred because of a lack of fencing around the pool.

Rouhani's claim was related to repeated application of non-slip-resistant paint on the concrete surface around Towers' pool. It had nothing to do with the design or construction of the pool, or the lack of a fence around it. Her claim would come under the "Designated Work Exclusion," but for the fact that exclusion does not apply to general maintenance, a broad category into which routine repainting neatly falls.

The Court therefore rejects Philadelphia's exclusion arguments. Consequently, as the terms of the Philadelphia policy appear to otherwise cover Rouhani's claim, the Court finds Berkley is entitled to judgment as a matter of law on the question of coverage. Consequently, Berkley's motion is GRANTED on this issue.[12]

### Conclusion

Berkley became subrogated to Rouhani's rights by contract or statute. Philadelphia is liable

---

[12] Because of the slight inconsistency, noted above, in the amount Berkley paid to Rouhani, the Court declines to enter judgment at this time. The question of the amount due is simply a question of math, on which the parties can hopefully agree.

for Towers' claim under the terms of its policy because no exclusions apply. Further, Philadelphia failed to provide competent summary judgment evidence sufficient to create a genuine issue of material fact on the question of whether it was prejudiced by Towers' lack of timely notification.

While the anti-assignment clause in the Philadelphia policy may have rendered ineffective any purported transfer of Towers' contractual rights, and Texas law prohibited assignment of any of Towers' claims under Chapter 541 of the Texas Insurance Code, all other assignments by Towers to Berkley were valid. Specifically, Towers' assignment of its *Stowers* rights to Berkley was effective, thereby eliminating as a matter of law Philadelphia's claim for contribution or indemnification by Nautilus. Finally, Berkley had standing to bring this suit as a nominal plaintiff, at least where, as here, the real party in interest was also joined and there was no resulting prejudice to Philadelphia.

Accordingly,

IT IS ORDERED that Philadelphia's Motion for Leave to File Amended Answer [#32] is GRANTED;

IT IS FURTHER ORDERED that Philadelphia's Motion for Summary Judgment [#34] is GRANTED IN PART and DENIED IN PART;

IT IS FURTHER ORDERED that Nautilus' Motion for Summary Judgment [#33] is GRANTED;

IT IS FINALLY ORDERED that Berkley's Motion for Summary Judgment [#31] is

GRANTED.

SIGNED this the ___27th___ day of April 2011.

SAM SPARKS
UNITED STATES DISTRICT JUDGE