IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2013 NOV 21  PM 1:56
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY

BERKLEY REGIONAL INSURANCE
COMPANY, as Subrogee of Venus Rouhani and as
Assignee/Subrogee of the Towers of Town Lake
Condominium Association,
                      Plaintiff,

-vs-                                                 Case No. A-10-CA-362-SS

PHILADELPHIA INDEMNITY INSURANCE
COMPANY,
                      Defendant.

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant Philadelphia Indemnity Insurance Company's Motion for Leave to File Third Amended Answer [#139];[1] Philadelphia's Motion for Summary Judgment [#140], Plaintiff Berkley Regional Insurance Company's Response [#159], and Philadelphia's Reply [#160]; and Philadelphia's Motion for Partial Summary Judgment [#144], Berkley's Response and Cross-Motion for Summary Judgment [#158], Philadelphia's Reply [#161], and Berkley's Replies [##162, 163]. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

In 2004, Venus Rouhani was injured when she slipped and fell on the concrete deck of a swimming pool located at the Towers of Town Lake Condominiums. Rouhani sued Towers, and a

---

[1] The Motion for Leave [#139] is GRANTED as unopposed.

jury awarded her $1,654,663.50, plus interest and costs. The verdict was affirmed on appeal. *Towers of Town Lake Condo. Ass'n v. Rouhani*, 296 S.W.3d 290 (Tex. App.—Austin 2009, pet. denied). A trio of insurance companies disputed who owed what to whom, but Nautilus Insurance Company, Towers's primary insurance carrier, ultimately paid the bulk of the judgment (up to its $1,000,000 policy limit, plus interest). Philadelphia, Towers's excess insurance carrier, refused to pay the remainder of the judgment on the theory Towers had failed to give Philadelphia notice of Rouhani's claim until after the verdict was rendered. Berkley, from whom Nautilus had obtained supersedeas bonds, therefore paid out the remaining $709,738.89 to Rouhani. Various deals were then struck amongst the parties, and Nautilus brought this suit against Philadelphia, but did so in Berkley's name as assignee and subrogee of all rights Rouhani, Towers, and Nautilus had against Philadelphia.

The parties ultimately moved for summary judgment on a variety of grounds. As relevant here, Berkley argued it was entitled to summary judgment because, even assuming Philadelphia received late notice of Rouhani's claim, Philadelphia could not show it was prejudiced by the delay. The Court did "not resolve the question of whether Philadelphia received timely notification" of Rouhani's claim because of fact issues regarding Berkley's theory of "constructive notice" to Philadelphia through an alleged agent, Wortham Insurance Group. Order of Apr. 27, 2011 [#71], at 18 & n.11. Instead, the Court held Philadelphia was not prejudiced as a matter of law by any failure to provide timely notice, and therefore granted summary judgment in favor of Berkley. *Id.* at 20–21.

Philadelphia appealed, and the Fifth Circuit reversed. *Berkley Reg'l Ins. Co. v. Philadelphia Indemn. Ins. Co.*, 690 F.3d 342 (5th Cir. 2012). The Fifth Circuit held Philadelphia "ha[d] presented sufficient facts in support of its position that it suffered prejudice to avoid summary judgment." *Id.* at 351. Accordingly, the court reversed the grant of summary judgment to Berkley. *Id.* The court did

*not* grant summary judgment in favor of Philadelphia, however, because "fact issues exist[ed]," and because Philadelphia had not moved for summary judgment on "late notice" grounds. *Id.* at 351–52; *see also id.* at 343 n.2 ("The district court determined, and the parties do not dispute, that there is a fact issue as to whether Philadelphia received 'constructive notice' through an insurance agent. . . . We express no opinion on this matter. We will assume . . . Philadelphia received no notice before the jury verdict was rendered, without prejudice to the factual development of this issue on remand."). The Fifth Circuit therefore remanded to this Court.

After additional post-remand discovery, the parties have now filed new summary judgment motions. Philadelphia has filed two summary judgment motions. First, Philadelphia seeks partial summary judgment on Berkley's "constructive notice" claim; Berkley has cross-moved for summary judgment on this issue. Second, assuming Philadelphia did not receive constructive notice, Philadelphia moves for summary judgment on the grounds it has shown it suffered prejudice as a result of Berkley's untimely notice. Berkley opposes this motion, but does not move for summary judgment on the issue.

As this Court previously observed, this case is contractually complex. The relationships among and between the various parties and non-parties are extraordinarily difficult to navigate given the parties' competing views of the roles of the players and the use of multiple, similar names by ostensibly different entities. As best the Court can deduce, the following cast of characters lists the major players and their basic, undisputed[2] roles.

---

[2] The parties do dispute whether the Wortham entities also served as Philadelphia's agent. The Court addresses this issue in ruling on the cross-motions for partial summary judgment.

| Entity | Role |
|---|---|
| Towers of Town Lake | The insured |
| Nautilus Insurance Company | The primary insurance carrier |
| Berkley Regional Insurance Company | Supersedeas bond provider; Nautilus's sister company |
| Philadelphia Indemnity Insurance Company | The excess insurance carrier |
| Consolidated Insurance Agency; d/b/a Wortham Insurance and Risk Management—Austin; a/k/a Wortham Insurance Group[3] | Towers's insurance agent/broker[4] |
| McGowan & Company, Inc. | The program administrator or managing general agent[5] of the Philadelphia excess insurance policy |

With these relationships in mind, the Court turns to the parties' motions for summary judgment.

## Analysis

### I.     Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp.*

---

[3] *See* Pl.'s Cross-Mot. Part. Summ. J. [#158-5], Ex. E, at 5–6 (Robert Bridges of Wortham Insurance & Risk Management discussing the relationship of the five differently named Wortham offices, and concluding "We are now all the Wortham—Wortham Group or Wortham Insurance and Risk Management"). The Court therefore joins the parties in referring to the various Wortham entities as "Wortham" in this order.

[4] The parties appear to use the terms "insurance agent" and "insurance broker" interchangeably. *E.g.*, Pl.'s Mot. Part. Summ. J. [#144], Ex. H, at 101 (Bridges testifying: "Typically I would refer to myself when working with a client as their insurance agent. That terms gets used in all kinds of different ways . . . . We sometimes refer to ourselves just as the broker.").

[5] A "managing general agent" is defined by Texas law as "a person, firm, or corporation that has supervisory responsibility for the local agency and field operations of an insurer in this state or that is authorized by an insurer to accept or process on the insurer's behalf insurance policies produced and sold by other agents." TEX. INS. CODE § 4053.001(3).

*v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant

and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.    Cross-Motions for Partial Summary Judgment—Constructive Notice

Philadelphia contends Berkley could not satisfy its contractual obligation to provide Philadelphia with notice of Rouhani's claim by notifying Wortham of the claim. Philadelphia first argues the insurance policy required notice to be given directly to Philadelphia, not to any agent. Alternatively, Philadelphia argues Wortham was only Towers's agent, not Philadelphia's agent, and Wortham thus lacked authority to accept notice on behalf of Philadelphia. Berkley reads the policy differently, but primarily contends Wortham was an agent of both Towers and Philadelphia.

### A.    Philadelphia's Policy

The Court turns first to interpretation of the policy. The relevant notice provision reads: "You must see to it that 'we' are notified promptly of an 'occurrence' or an 'offense' which involves" various enumerated types of injuries, including "[p]ermanent disabilities" and "[a]ny claim with an incurred exposure of $500,000 or above." Pl.'s Mot. Part. Summ. J. [#144], Ex. F. Philadelphia argues this language required Towers to notify Philadelphia and Philadelphia only; in other words, the policy simply forbids notice by agent. Berkley reads the policy differently, arguing the policy language does not support such a narrow construction.

Berkley has the better argument here. The phrase "see to it that we are notified promptly" is anything but a command for direct insured–insurer notice. It would be difficult to construct a more passively worded sentence. Towers was not required to "promptly notify Philadelphia," it was

required to "see to it" Philadelphia *was* "notified promptly." The language of the policy is not limited to direct notice; to the contrary, it seems explicitly drafted to allow for indirect notice, such as notice through an agent of the insurer. So long as Towers "sees to it" Philadelphia is notified—whether by Towers itself, or by Towers through an agent—Towers has complied with the terms of the policy. Philadelphia's strict construction of this phrase is unreasonable, and the Court therefore enforces "the policy according to its plain meaning," which allows for indirect notice. *See Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 773–74 (5th Cir. 2004).[6]

### B.   Notice to Wortham as Notice to Philadelphia

Although indirect notice is allowable under the policy, the parties' core dispute is whether such notice could be accomplished through Wortham. It is undisputed Wortham was Towers's agent. Towers apparently enlisted Wortham as an insurance broker to find a suitable excess policy for Towers. Wortham, in turn, contacted another broker, McGowan and Company. It was McGowan who ultimately secured the policy from Philadelphia. The chain of contact thus put Towers directly in contact with Wortham; Wortham directly in contact with McGowan; and McGowan in contact

---

[6] Philadelphia argues Berkley "acknowledges the Policy does not permit Towers to notify its insurance agent, instead of Philadelphia," citing to the deposition testimony of Richard Conrad, Berkley's corporate representative. Pl.'s Mot. Part. Summ. J. [#144], at 6. This loaded argument—presuming the validity of Philadelphia's later arguments on the merits—is simply a misrepresentation of Conrad's testimony. Conrad merely agreed with counsel's statements the policy does not expressly address the possibility of notice to an agent. *Id.*, Ex. G, at 54–56. Conrad's actual position is clear when his testimony is read in context. *E.g., id.* at 55 ("Q: Anywhere in [the policy] do you see where it would allow that the agent can be notified on behalf of Philadelphia? A: It doesn't specifically say that, but the language 'you must see to that [*sic*] we are notified' seems to contemplate or at least allow for the possibility of notification to Philadelphia by someone else."); *id.* at 56 ("Q: Based upon [the policy], sir, you would agree with me that the express terms under the policy *require the insured to promptly notify Philadelphia* of any occurrence regarding permanent disabilities or claims with an occurred exposure of $500,000 or more? A: I would agree that it requires the insured *to see that Philadelphia is notified promptly* of such an occurrence.") (emphasis added). Notably, it is actually Conrad's position which hews to the wording of the policy, while Philadelphia's counsel's question completely redrafts the relevant provision in direct, active language.

with Philadelphia. *See* Pl.'s Mot. Part. Summ. J. [#144], Ex. H, at 79–85 (Wortham's Robert Bridges describing the process of securing the excess policy with Philadelphia).

"It is true that, generally speaking, an insurance broker is considered the agent of the insured; if the insured reports a claim to the broker, but the broker fails to report it to the insurer, the insured is not relieved of his notice obligations." *Duzich v. Marine Office of Am. Corp.*, 980 S.W.2d 857, 865 (Tex. App.—Corpus Christi 1998, pet. denied). This is Philadelphia's theory of the case: Wortham was Towers's agent; Towers notified Wortham; Wortham failed to notify Philadelphia; Towers's notice obligation was therefore unmet, and summary judgment is proper. However, "Texas courts have recognized that, under some narrow sets of circumstances, an insurance agent may be deemed to have acted as the agent of both the insured and the insurer." *Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304, 318 (5th Cir. 2005); *McKillip v. Employers Fire Ins. Co.*, 932 S.W.2d 268, 270 (Tex. App.—Texarkana 1996, no writ). For example, "[a]n insurance agent can act as the agent of both the insured and the insurer by collecting the premium and delivering the policy for the carrier, and by procuring insurance for the insured." *Maintain, Inc. v. Maxson-Mahoney-Turner, Inc.*, 698 S.W.2d 469, 472 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.); *see also Duzich*, 980 S.W.2d at 865 ("[A]n insurance company may be estopped to deny that such broker is its own agent when that person has authority to perform various functions on the insurer's behalf."). This "dual agency" idea is Berkley's theory of the case.

Squarely presented, the issue for the Court is therefore whether, based on the summary judgment record, Wortham was Philadelphia's agent, capable of accepting notice on behalf of Philadelphia. Berkley answers in the affirmative, and its evidentiary argument rests almost entirely

on a series of "Agent Agreements" executed by Philadelphia. The Court now turns to those agreements, their relevance, and their influence on the outcome of this case.

The first Agent Agreement was executed in 2002 by Philadelphia and Consolidated Insurance Agency, Inc., d/b/a Consolidated Insurance Agency (CIA).[7] Def.'s Resp. [#158-4], Ex. D. The 2002 agreement states CIA "desires [Philadelphia] to insure risks of [CIA]'s clients." *Id.*, Ex. D, at 1. Through the agreement, Philadelphia then "appoints [CIA] as its representative, without exclusive territorial rights, subject to restrictions placed upon [CIA] by the laws of the state or states in which [CIA] is authorized to write insurance and further subject to the terms and conditions set forth herein." *Id.*, Ex. D, at 2. Continuing on, the agreement states: "[CIA] and its officers, agents or employees are not agents of, and have no authority, express or implied, to bind [Philadelphia] or any of its principals." *Id.* at 3. There are three similar agreements executed in later years between Philadelphia and (1) John L. Wortham & Son, L.P. (executed in 2006); (2) Wortham Fort Worth, Inc. (executed in 2007); and (3) John L. Wortham & Son LLP (executed in 2009). *Id.* [#158-7], Ex. G.

As a threshold matter, the Court must decide which of these agreements are even potentially relevant. Rouhani was injured in 2004 and filed suit in February 2005. Towers also provided notice of the suit to Wortham in February 2005. The Court therefore concludes the only relevant agreement is the 2002 agreement between Philadelphia and CIA.[8]

---

[7] As noted above, CIA and Wortham are apparently the same entity.

[8] The 2002 agreement has no specified ending or expiration date. There is no evidence regarding whether the 2002 agreement remained in effect in 2005. The parties proceed on the assumption it was, and the Court will therefore do the same. Additionally, even if the Court were to find the 2006 agreement was also relevant (because it was executed before trial), the agreements are nearly identical, and thus the Court's ultimate conclusion would not change.

Berkley argues the appointment of CIA as Philadelphia's representative in the 2002 agreement "conclusively prove[s]" an agency relationship existed, and therefore establishes notice to Wortham was notice to Philadelphia. *Id.* at 7. The difficulty Berkley encounters, however, is the provision of the 2002 agreement expressly stating CIA and its employees "are not agents of" Philadelphia. *Id.*, Ex. D, at 3. Berkley argues this provision merely precludes CIA from binding Philadelphia to coverage and therefore "has no bearing on this case." *Id.* at 8.

The Court finds Berkley's argument unpersuasive in light of the plain language of the 2002 agreement. Philadelphia agreed to let CIA act as one of its insurance brokers and sell Philadelphia policies, subject to final approval by Philadelphia. The parties expressly agreed CIA was *not* Philadelphia's agent. The agreement discusses the collection of and forwarding of premiums, and imposes certain obligations on CIA, but the agreement is silent as to any authority CIA has to accept notice of claims filed against any policy ultimately issued by Philadelphia.[9] CIA states it was never told, at any time, Towers (CIA's client) could notify Philadelphia under the policy by giving notice to Towers's insurance agent. Pl.'s Reply [#161-1], Ex. E, at 3. Similarly, CIA states it never instructed Towers it could notify Philadelphia by notifying CIA. *Id.*, Ex. E, at 4. CIA also claims Towers had never reported any claim against the Philadelphia policy to Philadelphia through CIA before or after Rouhani's accident in 2004. *Id.*, Ex. E, at 7–8.

Additional evidence in the record undermines Berkley's position. It was McGowan, not Wortham, which ultimately placed the policy with Philadelphia. *See* Pl.'s Mot. Part. Summ. J.

---

[9] To the extent Berkley seeks to fault Philadelphia for not expressly prohibiting CIA from accepting notice on Philadelphia's behalf in the 2002 agreement, Berkley attempts to read into the agreement an understanding not reflected by the words written on the pages. Moreover, Philadelphia *did* expressly prohibit CIA from accepting notice on its behalf by stating in the agreement CIA was *not* Philadelphia's agent.

[#144], Ex. H, at 77–79. Wortham, whether acting as Philadelphia's insurance broker or not, went through an additional insurance broker (McGowan) to obtain a suitable policy. *Id.* Wortham then presented McGowan's offered policy to Towers, and Towers chose the McGowan policy. *Id.* Wortham had no direct discussions with Philadelphia regarding the policy. *Id.* at 79. Towers paid the premium to Wortham, but Wortham forwarded the premium to McGowan, not Philadelphia. *Id.* at 81. This scenario is not among the "narrow sets of circumstances" in which an insurance broker has been deemed a dual agent under Texas law. *Monumental Life Ins. Co.*, 403 F.3d at 318.

Even if Wortham could in some limited sense be deemed Philadelphia's agent, Wortham still had no authority to accept notice of claims on Philadelphia's behalf. The 2002 agreement between CIA and Philadelphia contained no express grant of authority to accept notice of claims. *See Crooks v. M1 Real Estate Partners, Ltd.*, 238 S.W.3d 474, 483 (Tex. App.—Dallas 2007, pet. denied) ("Express authority is delegated to an agent by words that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal."). Wortham therefore could not have had the implied authority to do so, either. *See id.* ("An agent who does not have express authority cannot have implied authority.").

Berkley's most viable argument suggests Wortham had apparent authority to accept notice on behalf of Philadelphia. *See NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952–53 (Tex. 1996) ("To establish apparent authority, one must show that a principal either knowingly permitted an agent to hold itself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority."). Towers has stated it believed all it needed to do was notify Wortham of a claim, and thereafter Wortham would handle notice to the carriers. This is an accurate description of the parties' relationship: Wortham, as Towers's insurance broker, conveyed notice to the primary

and excess carrier (as appropriate) on Towers's behalf. But this is not to say Towers's notification of Wortham amounted to *constructive notice* to the carrier, meaning notice would be deemed given *even if Wortham never told the carrier about the claim.*

The Court finds no support in either the record or the law for the notion Philadelphia, as the excess carrier, had constructive notice of every claim Towers submitted to Wortham. Berkley has not cited a single case, from Texas or elsewhere, in which an insurance broker was deemed to be the agent of the insurer and the insurer was charged with having constructive notice of a claim when the broker received the notice. On a slightly less specific inquiry, Berkley has not even provided a single citation to a case in which an insurer was deemed to have constructive notice of a claim by virtue of notice to an agent. Instead, Berkley relies on generic agency principles, citing cases involving attorneys having notice of documents received by their employees. *E.g., Elite Towing, Inc. v. LSI Fin. Grp.*, 985 S.W.2d 635, 642–43 (Tex. App.—Austin 1999, no pet.).

Berkley argues Towers was justified in believing Wortham had authority to accept notice of claims on behalf of Philadelphia because the language of the Philadelphia policy did not forbid notice by an agent, and the only contact addresses on the policy were for CIA and Wortham, not Philadelphia. "A court may consider *only the conduct of the principal* leading a third party to believe that the agent has authority in determining whether an agent has apparent authority." *Id.* at 953 (emphasis added). There is no evidence Towers ever interacted directly with Philadelphia. There is also no evidence Towers relied upon the addresses on the Philadelphia policy to conclude Wortham had authority to accept notice on Philadelphia's behalf. Instead, the testimony of both Towers and Wortham shows the parties' course of dealing involved Towers giving notice to Wortham, and Wortham subsequently forwarding the notice to the relevant carrier. Wortham, for whatever reason,

may have been mistaken in not forwarding Rouhani's claim to Philadelphia in 2005. But Wortham's failure to do so did not relieve Towers of its obligation to "see to it" Philadelphia "was notified," and therefore did not satisfy the notice provisions of the policy. See Duzich, 980 S.W.2d at 865.

Philadelphia's partial motion for summary judgment on the issue of agency and constructive notice is GRANTED, and Berkley's cross-motion on the same issue is DENIED.

### III.     Philadelphia's Motion for Summary Judgment—Prejudice

Having rejected Berkley's constructive notice argument, the Court must conclude Philadelphia did not receive notice of Rouhani's claim until it was informed of the jury verdict in excess of Nautilus's policy limits. The final issue is thus the resolution of the issue the Fifth Circuit considered on appeal in this case, but was unable to definitively decide because of the factual dispute over the constructive notice issue. Philadelphia argues it has shown it was prejudiced by the late notice of Rouhani's claim. Berkley argues Philadelphia has not proven it was prejudiced, and further argues there is now a fact issue regarding whether the post-verdict notice to Philadelphia was untimely.

#### A.     Timeliness of Post-Verdict Notice

Philadelphia's policy required Towers to notify Philadelphia of any claim with an incurred exposure of $500,000 or more. Pl.'s Mot. Part. Summ. J. [#144], Ex. F. Berkley now argues Rouhani's claim did not trigger the notice requirement of the policy because Towers's defense counsel thought the lawsuit was frivolous.

Philadelphia contends the Fifth Circuit previously decided this question on appeal. It did not. The Fifth Circuit did recognize Philadelphia's position on the triggering of the notice requirement. "*According to Philadelphia*, the circumstances surrounding the underlying litigation triggered the

notice requirement, and the lack of notice prior to the adverse jury verdict caused prejudice, thereby precluding coverage." *Berkley Reg'l Ins. Co.*, 690 F.3d at 344 (emphasis added). The Fifth Circuit's opinion begins with the premise the notice requirement was triggered. The parties' initial round of summary judgment motions similarly took for granted the notice provision was triggered, and did not dispute the issue before this Court. For this reason, whether the notice obligation was triggered was not addressed in this Court's previous order, from which the parties appealed, and was not addressed by the Fifth Circuit, other than to acknowledge Philadelphia's basis for claiming it should have been given notice.[10] *See* Order of Apr. 27, 2011 [#71]; *Berkley Reg'l Ins. Co.*, 690 F.3d at 344.

Confronting the issue for the first time, this Court finds the notice provision of the policy was triggered by Rouhani's claim. Experts for both sides estimated Rouhani's damages from her inability to continue working as a dentist due to her arm injury to be far in excess of $500,000. *Berkley Reg'l Ins. Co.*, 690 F.3d at 343 (noting estimated damages of $800,000 and $1.25 million). Earlier valuations of the case by Nautilus put the damage exposure range "in the area of $325,000 to $500,000," while acknowledging Rouhani's demands for significantly more. Def.'s Resp. [#159-6], Ex. 6. After deposing Rouhani's physician, Nautilus internally described the lawsuit as "a very dangerous case," one where it was "certainly possible" for an adverse verdict "well in excess of $1,000,000.00" to be awarded, even though Nautilus remained confident it could win the liability

---

[10] Philadelphia claims the Fifth Circuit's acknowledgment of Philadelphia's arguments means the court "impliedly found that the notice requirements were triggered." Pl.'s Mot. Summ. J. [#140], at 3. Repeating a party's argument is not an implied finding. The Fifth Circuit, like the parties back in 2011, assumed notice was required in order to resolve the prejudice issue the parties actually litigated. The Court also rejects Philadelphia's position Berkley waived its argument regarding the notice trigger because it did not raise the issue on appeal. The issue was not raised before this Court, and Berkley should not be faulted for failing to raise a new defense on appeal (in which case Philadelphia would have surely argued Berkley had not preserved the issue for appeal).

case. *Id.* [#159-4], Ex. D. Rouhani's claim plainly *exposed* Nautilus to more than $500,000 in damages, and Philadelphia's policy requires notice of the claim to be given in such situations.[11]

Berkley argues this notice trigger question is controlled by *Harbor Insurance Co. v. Trammell Crow Co.*, 854 F.2d 94 (5th Cir. 1988), in which the Fifth Circuit found a fact issue existed concerning the insured's duty to notify an excess carrier. First, *Harbor Insurance* is immediately distinguishable on its facts because the notice provision there is considerably different from Philadelphia's notice provision. *See id.* at 96 (notice provision required notice "as soon as practicable" when insured "may reasonably conclude" a claim was "likely to involve" the excess policy). Additionally, the *Harbor Insurance* policy expressly covered situations in which a case did not initially appear to require notice, but later-adduced facts then triggered the requirement. *Id.* No similar language appears in Philadelphia's policy, and the Fifth Circuit's holding thus has little bearing on the policy at issue in this case. Second, *Harbor Insurance* is also distinguishable because the excess trigger amount there was $500,000, the full value of the primary policy, and the insured's counsel believed the case would not exceed $500,000. *Id.* Philadelphia's notice requirement was triggered at half of the primary policy's cap, and both sides valued the case and recognized the exposure on the case could easily exceed that amount.

### B.   Prejudice to Philadelphia

Finally, the Court must again consider whether Philadelphia was prejudiced by not receiving notice of Rouhani's claim until after the verdict. Philadelphia again argues the Fifth Circuit's opinion

---

[11] Berkley's motion focuses on Nautilus's belief the claim was worth far less than the limit of its policy, $1,000,000. Because the notice requirement expressly requires notice in situations where there is an incurred exposure exceeding *half* the policy limit, $500,000, it is irrelevant whether Nautilus believed it was exposed to more than $1,000,000 in damages.

on appeal answered this question, and in any event Philadelphia has established it was prejudiced. Berkley argues the question of prejudice must be resolved by the jury.

As this Court has previously explained to counsel in this case, the Fifth Circuit did not *hold* Philadelphia was prejudiced as a matter of law. Instead, the court's holding was narrower: "Philadelphia ha[d] presented sufficient facts in support of its position that it suffered prejudice to avoid summary judgment," so the court reversed this Court's grant of summary judgment in favor of Berkley. *Berkley Reg'l Ins. Co.*, 690 F.3d at 351–52. The court did *not* grant summary judgment in favor of Philadelphia on the prejudice issue, for two reasons: (1) the court was "unable to reach th[e] issue because fact issues exist," namely whether Philadelphia had received constructive notice of Rouhani's claim in 2005, which would make the question of prejudice irrelevant; and (2) Philadelphia never affirmatively moved for summary judgment on the basis it was prejudiced by the late notice. *Id.* at 352 & n.22. The court's *holding* was thus limited to reversing the grant of summary judgment and remanding so this Court could "address Philadelphia's argument in the first instance in light of the analysis here provided." *Id.* at 352.

Philadelphia has now moved for summary judgment on the issue of prejudice, and this Court must therefore follow the Fifth Circuit's guidance in deciding the question "in the first instance." While the Fifth Circuit did not grant summary judgment in favor of Philadelphia on this issue, because it could not, its opinion strongly suggests Philadelphia was prejudiced as a matter of law. The Fifth Circuit canvassed Texas law on this question, and ultimately concluded notice-of-claim provisions afford the insurer "valuable right[s]," the deprivation of which may establish prejudice as a matter of law. *Id.* at 345–51. Turning to the facts of this case, the Fifth Circuit walked through a detailed analysis of the various ways in which Philadelphia was prejudiced.

At the outset, the court "disagree[d] with Berkley" and noted Philadelphia's case was one in which notice, by virtue of coming after an adverse jury verdict was rendered, was not just late, but wholly lacking. *Id.* at 350 (citing *Nat'l Union Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 609 (Tex. 2008)). As a result, Philadelphia "lost the ability to do any investigation or conduct its own analysis of the case, as well as the ability to 'join in' Nautilus's evaluation of the case." *Id.* Additionally, "Philadelphia lost a seat at the mediation table." *Id.* Acknowledging the fact it is impossible to know, in hindsight, how Philadelphia's involvement (if it chose to get involved at all) would have altered the outcome of the case, the court nevertheless found Philadelphia's "rights were lost, leaving Philadelphia holding the bag for more than $700,000 in excess liability if Berkley prevails." *Id.* at 351. The court also rejected the idea Philadelphia could have meaningfully participated on appeal. *Id.* In the Fifth Circuit's words, "[t]he cows had long since left the barn when Philadelphia was invited to close the barn door." *Id.*

Having considered Philadelphia's motion "in light of the analysis" provided by the Fifth Circuit, the Court must conclude Philadelphia was prejudiced as a matter of law by its lack of notice of the Rouhani claim.[12] Regardless of whether Philadelphia would have actually participated in the suit, which is the central focus of Berkley's response, Philadelphia's valuable "rights were lost," including the right to have "a seat at the mediation table," because it had no notice of the claim. *Id.*; *see also Prince George's Cnty. v. Local Gov't Ins. Trust*, 879 A.2d 81 (Md. 2005) (cited favorably by the Fifth Circuit for its holding prejudice exists as a matter of law where excess carrier did not

---

[12] Berkley argues the Texas Supreme Court has changed the law since the Fifth Circuit decided the appeal in this case, citing *Lennar Corp. v. Markel Am. Ins. Co.*, No. 11-0394, 2013 WL 4492800 (Tex. Aug. 23, 2013). *Lennar* held, under the specific facts of that case, whether an insurer was prejudiced by a unilateral settlement made by the insured turned on factual questions. *Id.* at *4. *Lennar* made no pronouncements about prejudice more broadly, and has no apparent relevance to this case.

receive notice of a claim until after a jury verdict).[13] The Court therefore grants Philadelphia's motion for summary judgment.

## Conclusion

Accordingly,

IT IS ORDERED that Defendant Philadelphia Indemnity Insurance Company's Motion for Leave to File Third Amended Answer [#139] is GRANTED;

IT IS FURTHER ORDERED that Philadelphia's Motion for Summary Judgment [#140] is GRANTED;

IT IS FURTHER ORDERED that Philadelphia's Motion for Partial Summary Judgment [#144] is GRANTED;

IT IS FINALLY ORDERED that Berkley's Cross-Motion for Summary Judgment [#158] is DENIED.

SIGNED this the 21st day of November 2013.

                                                  *Sam Sparks*
                                                  SAM SPARKS
                                                  UNITED STATES DISTRICT JUDGE

---

[13] In fact, *Prince George's County* represents a scenario strikingly similar to this case, as the court there explained: "By failing to notify the [excess insurer] of the incident, claim, and lawsuit until after the judgment, the [insured] nullified unilaterally all of the [excess insurer]'s rights and presented the [excess insurer] with a *fait accompli*. The [insured] may be correct that the attempts of the [excess insurer] to criticize particular trial choices made by the [insured] and to argue that those choices increased the judgment represent '20/20 hindsight.' The [insured], however, put the [excess insurer] in the position of proving a negative and speculating about what could have been. The [excess insurer] need not speculate. By itself, the abrogation of *all* of the [excess insurer]'s contractual rights constituted prejudice." 879 A.2d at 100.